**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MINDY ADAMS,** | ) | **Case No. 1:12-cv-00644** |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MAGISTRATE: McHARGH** |
| | ) | |
| **vs.** | ) | |
| | ) | **BRIEF IN OPPOSITION TO** |
| **VALEGA'S PROFESSIONAL** | ) | **MOTION FOR SUMMARY JUDGMENT** |
| **HOME CLEANING INC., et. al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

Plaintiff, Mindy Adams, by and through her counsel, hereby respectfully submits her Brief in Opposition to Defendants Valega Professional Home Cleaning, Inc., Diversified Employee Solutions, Capital Dimensions, Inc. and Janis Valega's Motion for Summary Judgment and requests that this Court deny said motion for the reasons more fully set forth the reasons accompanying memorandum in opposition attached and incorporated herein as if fully rewritten.

Respectfully submitted,

/ss/ *Natalie Grubb*
Natalie F. Grubb (0062596)
437 W. Lafayette Road
Suite 260-A
Medina, Ohio 44256
PH: (330) 725-7252
FAX: (330) 723-1095
E-Mail: officemgr@grubbandassoc.com
*Attorneys for Plaintiff Mindy Adams*

## TABLE OF CONTENTS

**Page**

**TABLE OF AUTHORITIES** ............................................................................................ **iii**

**TABLE OF EXHIBITS** ................................................................................................. **iii**

**STATEMENT OF ISSUES** ............................................................................................ **iv**

**SUMMARY OF ARGUMENT** ....................................................................................... **iv**

**INTRODUCTION** ........................................................................................................... **1**

**STATEMENT OF FACTS** ............................................................................................... **1**

**LAW AND ARGUMENT** .............................................................................................. **12**

**CONCLUSION** .............................................................................................................. **20**

**CERTIFICATE OF SERVICE** ..................................................................................... **21**

## TABLE OF AUTHORITIES

**Cases:**                                                                        **Page**

*Cavin v. Honda of Am. Mfg., Inc.,* 346 F.3d 713 (6th Cir.2003). .................................................18
*Den Hartog v. Wasatch Acad.,* 123 F.3d 1067 (10th Cir. 1997)  ...............................................18
*Dobrowski v. Jay Dee Contrs., Inc.* 571 F.3d 551 (6th Cir. 2009)…………………………… 13
*Donald v. Sybra, Inc.,* 667 F.3d 757 (6th Cir. 2012). ............................................................14, 15
*Edgar v. JAC Products, Inc.,* 443 F.3d 501 (6th Cir. 2006). ......................................................14
*Grace v. USCAR,* 521 F.3d 655 (6th Cir. 2008).. ........................................................................14
*Killian v. Yorozu Auto. Tenn., Inc.,* 454 F.3d 594 (6th Cir. 2006)...............................................14
*Russell v. Bronson Heating  & Cooling,* 345 F.Supp.2d 761 (E.D. Mich. 2004)........................13
*Russell v. N. Broward Hosp.,* 346 F.3d 1335 (11th Cir. 2003)....................................................18
*Stansberry v. Air Wisconsin Airlines Corp.,* 651 F.3d 482 (6th Cir. 2011) ...........................18, 19

**Statutes/Regulations:**                                                         **Page**

29 U.S.C. § 2611 ................................................................................................................... 12
29 C.F.R §825.106 ...............................................................................................................12, 13
Ohio R.C. Chapter 4125.01...................................................................................................12, 13
Ohio Administrative Code 4123-17-15 .................................................................................12, 13

## TABLE OF EXHIBITS

Exhibit 1        Steven Oddo's Deposition (Exhibit A to Oddo's Deposition has been designated
                 Confidential by Defendant's and will be filed under Seal.  Portions of this brief
                 discussing contents of Exhibit A have been redacted/blacked-out).
Exhibit 2        Janice Valega's Deposition
Exhibit 3        Charlene Halblaub Deposition
Exhibit 4        Mark Kimberlin Deposition
Exhibit 5        Laura Mills Letter Dated 9/10/12
Exhibit 6        Mindy Adam's Deposition
Exhibit 7        Mindy Adam's Affidavit Dated 9/12/12
Exhibit 8        Audrey Artino's Affidavit Dated 9/4/12
Exhibit 9        Copy of Ohio R.C. Chapter 4125.01 and O.A.C 4123-17-15

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether a Joint Employer Relationship Exists between Defendants Valega's Professional Home Cleaning, Inc. and Diversified Employee Solutions and/or Capital Dimensions, Inc. under the Family and Medical Leave Act ("FMLA")?

2. Whether Plaintiff has set forth sufficient facts to support her claim of interference/retaliation with her rights under the FMLA?

3. Whether Plaintiff has set forth sufficient facts to support her Americans with Disabilities Act associational discrimination claim against Defendants?

## SUMMARY OF ARGUMENT TO BE PRESENTED

As outlined below, the facts establish that Diversified Employee Solutions ("DES")/Capital Dimensions, Inc. ("Capital") through contract, statute and actions have a "joint employer" relationship with Valega's Professional Home Cleaning, Inc. d/b/a SERVPRO of Medina County ("SERVPRO") necessary to provide Plaintiff Mindy Adams ("Adams") eligibility under the Family and Medical Leave Act ("FMLA")

Based on the facts below a genuine issue of material fact exists as to Plaintiff's FMLA retaliation and interference claims.  The facts establish a sufficient causal connection between Adams' protected activity in filing for FMLA leave and being approved for same and the termination of her employment only a week later.   These facts include, but are not limited to, SERVPRO using Adams' absences from work related to her husband's serious health condition as a factor in her termination, and statements made by her supervisor Mark Kimberlin ("Kimberlin") to the effect that the job would have been too much for her to handle.

The facts will also establish that SERVPRO can state a prima facie claim of Associational Discrimination claim in violation of the Americans with Disabilities Act (ADA) as outlined below

iv

because Adams time off from work to care for her husband was a motivating factor in the decision to terminate her employ as evidenced by Kimberlin's statements and SERVPRO's owner Janis Valega's affidavit.   In addition, while equally applicable to the FMLA claims, Adams will establish that the reasons for her termination were pre-text as the proffered reasons were either not true, overstated, or other similarly situated employees were not disciplined for the same alleged conduct which purportedly formed the basis for Adams' dismissal.

## MEMORANDUM IN OPPOSITION

I. <u>INTRODUCTION</u>

Contrary to the Defendants' assertions, Plaintiff Mindy Adams' claims of violations of the Family and Medical Leave Act ("FMLA") and the Americans with Disabilities Act ("ADA") do have a basis in fact.  Furthermore, the support for Plaintiff's claims that the Defendants' actions were discriminatory and unlawful are evidenced by the ever changing reasons presented by the Defendants for the termination of Plaintiff's employment approximately a week after she had been approved for intermittent FMLA leave.   As a result, genuine issues of material fact exist and summary judgment on Defendants' claims is therefore inappropriate.

II. <u>STATEMENT OF FACTS</u>

A. <u>Defendants'/Relationship of Defendants</u>

Valega's Professional Home Cleaning, Inc. d/b/a SERVPRO of Medina County ("SERVPRO") is a cleaning and restoration services company owned by Janis Valega since 1998. (Janis Valega "Valega" Deposition Transcript., pg. 9).   Diversified Employee Solutions ("DES") is considered by Valega to be SERVPRO's human resources ("HR") department. (Valega Tr., pg. 28).  As SERVPRO's HR Department, DES handles much of the new hire process after the application stage as well as firing, benefits, etc.

Diversified Employee Solutions ("DES") is a company owned by Stephen Oddo ("Oddo"). (Stephen Oddo, "Oddo" Transcript ("Tr."). pg. 10-11).  DES operates as a professional employer organization ("PEO") (Oddo Tr. pg. 15-16).   According to Oddo, DES processes payroll for clients, manages workers' compensation claims, tax administration, recruiting of employees.  (Oddo Tr., pgs. 23-24).  DES is registered with the Ohio Department of Job and Family Services ("ODJFS") and the Ohio Bureau of Workers' Compensation ("BWC") as a PEO. (Oddo Tr. pg. 45).   DES has approximately 14 persons that it directly employs. (Oddo Tr., pg.

1

14)  For approximately 13 years SERVPRO has been a customer of DES.[1] (Oddo Tr., pg. 23). DES has approximately 150 "clients" who have according to DES have  369 "employees" that work within 75 miles of DES offices in Medina, Ohio (Oddo Tr., pg. 40; Letter from Laura Mills 9/10/12).

    In addition to DES, Oddo owns Capital Dimensions, Inc. ("Capital"), which, according to Oddo, only processes payroll. (Oddo Tr., pgs. 28).   Capital shares DES office space, has no employees of its own, and DES employees perform actions on behalf of Capital.[2] (Oddo Tr., pg. 28-29; Mills Letter 9/10/12).   As with DES, Capital is registered with the ODJFS and the Ohio BWC.  (Oddo Tr., pg. 29).   Capital's "clients" have approximately 119 "employees" that work within 75 miles of Capital's offices (which are shared with DES, and not far from SERVPRO in Medina, Ohio). (Mills Letter 9/10/12).   On or about July 27, 2010, SERVPRO and Capital Entered into a "Service Agreement."  (Oddo Tr., pg. 47).   Prior to that point, there was no relationship between SERVPRO and Capital, but instead DES had the sole relationship with SERVPRO. (Oddo Tr., pg. 39). To the best of Oddo's recollection the services provided to SERVPRO during the previous 13 years, which by extension were provided by DES, did not change materially from those purportedly provided by Capital – through a service agreement which will be discussed below.  Not surprisingly, DES personnel perform all functions required by Capital necessary to service Capital "clients." (Oddo Tr., pg. 71).

    Consistent with this, to service both DES and Capital "clients", DES employs a staff of approximately 12-14 individuals (Oddo Tr., pg. 14).  Capital has no employees of its own and DES employees, such as Stephanie Postek, perform all functions to service Capital "clients."

---

[1] As an important note regarding the difficulty Plaintiff has encountered getting straight answers from Defendants in this case.  Defendants have at various times maintained that DES had **NO** relationship with SERVPRO. (Oddo Tr., Exhibit D). This assertion is obviously false and should factor into the Court's decision-making process on summary judgment.  (Oddo Tr., pg. 68).

[2] DES and Capital share the same address and same building.  (See Amended Complaint).

(Oddo Tr., pgs. 55-56, 61, 71).   Not surprisingly SERVPRO personnel equate DES and Capital as the same entity.  (Charlene Halblaub "Halblaub" Tr., pg. 25).

As another example of the close relationship between the Defendants, SERVPRO personnel were provided a DES "Employee Handbook" in 2009 (Mark Kimberlin "Kimberlin" Tr., pg. 17).     The DES Employee Handbook contained provisions "welcoming" the persons receiving the handbook to DES.  (Kimberlin Tr., Ex. H).  The DES Handbook also notes that DES is the "legal employer."  (Kimberlin Tr., Ex. H, pg. 8).   Interestingly, the DES Handbook identifies that FMLA is available.  (Kimberlin Tr., Ex. H, pg. 12).   In 2010, the DES Handbook was supplanted by a handbook from SERVPRO.   (Valega Tr. Ex. J; Kimberlin Tr., pg. 17). However, SERVPRO Handbook continues to list DES as the "legal employer" and references the availability of FMLA leave.  (*Id*.).

According to Audrey Artino, a former President of SERVPRO, DES has been involved in the decision making process to hire and fire SERVPRO personnel.  (Affidavit of Audrey Artino, ¶ 5).   During Artino's time with SERVPRO there were several occasions where a potential employee application/information was sent to DES and DES would advise SERVPRO not to hire the potential employee. (Artino Aff., ¶ 5). Several times this occurred because DES was worried about the potential employee's past workers' compensation claims. (*Id*). If DES advised SERVPRO not to hire a particular individual, then the individual was not hired.     (*Id*.) In particular, Adams' hiring had to be approved by SERVPRO.  (Artino Aff., ¶ 8).   With regard to DES involvement in employee terminations, Artino herself was terminated by Tina Brostek, a DES employee as was another SERVPRO personnel.  (Artino Aff. 6-7).   Also, DES would provide work for SERVPRO personnel when they were on light-duty due to a workers' compensation injury.  (Artino Aff., ¶ 9; Valega Tr., pg. 157).  Even Halblaub and Valega noted

3

that in the past DES has been involved in termination of SERVPRO personnel. (Halblaub Tr., pg. 26) (Valega Tr., pgs. 156-157).

  B.  Capital Contract With SERVPRO **[UNREDACTED IN SEALED VERSION]**

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

  C.  Mindy Adams' Employment

  On or around August 2009, Adams applied for a position with SERVPRO.    As a part of the hiring process, DES completed both a "D.E.S. Employee Info Sheet" and an Ohio New Hire

---

[3] Oddo acknowledged all of DES clients have contracts. (Oddo Tr., pg. 58).

Report[4] identifying DES as Adams' employer (Oddo Tr., Dep. Ex. B).  Adams officially started working with SERVPRO on August 31, 2009. (Valega Tr., Ex. K, ¶ 4).  Adams received paychecks from both DES and Capital from August 2009 to October 2010. (Affidavit of Mindy Adams "Adams Aff.", 9/12/12, ¶ 2)  Around approximately January 2010, Adams first began receiving paychecks from Capital. (Adams Aff. 9/12/12, ¶2).  Adams also received healthcare through insurance policies obtained by DES.  (Valega Tr., pg. 63; Valega Tr., Ex. F, Ex. G).

In July 2010, Adams had to take a week off of work to take care of her sick husband. (Adams Aff. 9/12/12, ¶ 21).  Prior to August 20, 2010, Adams had not received any discipline, such as write-ups, related to her time at SERVPRO.

On or about August 20, 2010, Adams' husband was diagnosed with stage four cancer. (Adams Tr., pg. 199).  SERVPRO management, including Valega, Kimberlin and Halblaub received notice of the diagnosis shortly thereafter.  (Kimberlin Tr., pg. 20; Valega Tr., pgs. 88-89).  Valega, Kimberlin and Halblaub were aware that Adams's husband had had prior health issues in July 2010.  (Valega Trans. Ex. K, Attachment A).

On Friday August 20, 2010, Adams called in to SERVPRO and advised that her husband was very sick and she had to take him to the emergency room.  (Adams Tr., pgs. 92-96; Halblaub Tr., Ex. L).  Later that day Adams asked to have another co-worker cover her "on-call" shift that Sunday.  (*Id*.).  Adams was able to find a co-worker to cover her "on-call" shift for August 22, 2010, however, on August 22, 2010, the co-worker became sick and left work. (*Id*.).  Adams was paged to show up at work, but did not receive the page on August 22nd.  (*Id.*).

On August 24, 2010, Adams was written up for this incident.  (*Id.*).  SERVPRO acknowledged in the write-up that they were frustrated with Adams taking time off because of her

---

[4]  An Ohio New Hire Report is required to be provided to the Ohio Dept. of Job and Family Services by an "employer" under R.C. 3121.891.

husband's illness, and further that "management feels at this time the employee may need to be put on a part-time schedule." (*Id.*). Adams refused this suggestion. (Valega Tr., pg. 80). According to Kimberlin, Production Manager, SERVPRO had never requested that a full-time employee take a part-time position, and Adams was the only person to whom such a suggestion was made. (Kimberlin Tr., pgs. 25-26). Kimberlin acknowledged that part-time schedule would consist of SERVPRO contacting Adams, if and when they needed her – "it would be basically, if we need you, we call you to come to work." (Kimberlin Tr., pg. 24). SERVPRO, therefore, intended only to have Adams work when they wanted her to, and had no intention of giving her regular hours. The part-time offer, was prompted at least in part to concerns about Adams "being on call and not being able to work it or something." (Kimberlin Tr., pg 27). Halblaub, Operations Manager, concurred noting that it is imperative that SERVPRO personnel be able to work 40 plus hours, and accept mandatory overtime. (Halblaub Tr., pg. 69-70). Kimberlin acknowledged that in 2009 and 2010 that lateness and absenteeism was a problem with other SERVPRO personnel not just Adams. (Kimberlin Tr., pg. 31). And normally, according to Kimberlin, an employee is not written up for not being able to respond to an "on-call" page if there is a medical emergency involved. (Kimberlin Tr., pgs. 37-38).

In or about mid-September 2010, Plaintiff had a brief discussion about FMLA with Valega and Halblaub and was directed to contact DES. (Valega Tr., Ex. K – Att. A; Adams Tr., pg. 174). On or about September 27, 2010, Plaintiff received FMLA paperwork from DES. (Oddo Tr., pg. 65; Adams Tr., Exhibit 5). The paperwork was completed by Stefanie Postek, DES Human Resources Director and listed DES as Adams' employer (Oddo Tr., Ex. C). Around this time, Adams had a discussion with Kimberlin regarding her FMLA request and indicated that she wanted to be removed from the "on call" schedule due to her need to have flexibility to take

care of her husband.  (Adams Tr., pgs. 217-218, 222).  Kimberlin told her it was not possible to make any schedule adjustment for her.  (*Id*.)  On or about this same time, Kimberlin, who lives across from Adams, rudely interrupted a family get-together at Adams house. (Adams Tr., pgs. 235-236). Adams family was getting together to say goodbye to her husband, and Kimberlin who was aware of the seriousness of Adams' husband's condition in a rude manner asked "what the hell is going on" and "why there were so many cars in the street." (*Id.*).

On October 4, 2010, DES received the FMLA paperwork back from Adam's husbands' doctor. (Adams Tr., Ex.7).  On October 6, 2010, her FMLA request was approved (Valega Trans. Ex. K – Att. A).  On or about that same day Adams provided a copy of the FMLA paperwok to SERPRO'S office.  (Adams Tr., pg. 176).

On October 13, 2010, Adams attended a work in progress meeting (Adams Tr., pg. 106). Adams was unclear about which vehicles were to be taken, who she was to be riding with to a job, and how to proceed on her assigned job. (Adams Tr., pg. 108).   Kimberlin went into a manager's meeting.  (Adams Tr., pg. 106).   Around this time, Adams had a discussion with a co-worker, Lori, regarding another job scheduled for that morning.  (Adams Tr., pg. 126).   In response to Lori's comments, Adams told Lori that Lori was already scheduled to be on another job and to check with the office.  (Adams Tr., pg. 126).  When Kimberlin came out of the meeting he told Adams and her co-worker to get in the van and go to the job.  (Kimberlin Tr., pg. 50).  Adams sought to discuss the issues, but was told to go to the job. (Kimberlin Tr., pg. 53).  Later that day, after working with Kimberlin without incident, back at SERVRPO Adams was called into a meeting with Halblaub and Kimberlin and told that her employment was being terminated for "attitude."  (Adams Tr., pg. 17).  According to Kimberlin, he and Halblaub had a final write-up prepared at the time they terminated Adams.  (Kimberlin Tr., Pg. 74).   Notably, Adams was

never shown or even given a copy of this "final write-up."  (Adams Aff. 9/12/12, ¶ 4).   In her deposition, Halblaub asserts that Adams refused to go to the job, however, Kimberlin's own written statement from that day never states she refused to get in the truck.  (Halblaub Tr., pg. 93; Kimberlin Tr., pg. 53).  Kimberlin's written statement at the time confirms this and makes no mention of Adams having attitude or being insubordinate.  (Kimberlin Tr., pgs. 73-74; Halblaub Tr., Ex. L).

The next day, October 14, 2010, when Adams went to return her uniforms and other equipment to DES, she was told by Mary Jo Addleman, a DES employee, that she had been terminated for "insubordination." (Adams Tr., pg. 18).   Adams questioned Addleman about how the reason for her termination changed from "attitude" to "insubordination" but was not given a response.  (Adams Tr., pgs. 18-20).   The record shows that the final write up was not completed until days after the termination meeting, and that DES and SERVPRO personnel corroborated on the final write-up that was finished on October 20, 2012.  (Halblaub Tr., Ex. L).  In contrast, According to Valega, Adam's employment was terminated due to absenteeism, insubordination, and misbehavior to customers.   (Valega Tr., Ex. K – Attachment A, ¶ 13).

Sometime in late December 2010, Kimberlin came over to Adams house, unsolicited, and told Adams that "the job would have been too much for her." (Adams Tr., pg. 237; Adams Aff., ¶ 5)  Adams responded "that should have been my choice." (Adams Aff., ¶ 5).  To which Kimberlin responded "I know." (*Id*.) In March 2011, Adams Husband passed away from cancer. (Adams Tr., pg. 21).

D.  The Other Purported Justifications for Adams' Dismissal

As noted above, SERVPRO alleges that in addition to the alleged attitude/insubordination on October 13, 2010, that Adams had other performance issues that justified her termination.

1) <u>The Brihan Job</u>

On or about June 6, 2010, Adams and a co-worker were assigned to clean up the Brihan residence which had sustained basement damage due to sewage backflow.  (Adams Tr., pgs. 76-92).  Bonnie Brihan, the homeowner, was upset regarding the sewage damage to her home before Adams and her co-worker even showed up on site.  (Adams Tr., pg. 81).  Ms. Brihan was also upset about the estimate for the work and the scheduling of the time for the SERVPRO crew to arrive.  (*Id*). Unfortunately, Ms. Brihan was a difficult customer, and nothing Adams could do would satisfy Ms. Brihan.  (Adams Tr., pg. 81).  Adams documented this in her work report.  (Halblaub Tr., Ex. M).  After the initial visit by Adams and her co-worker, Ms. Brihan called in and requested another crew come out to finish the cleanup of her home.  (Halblaub Tr., pg. 107).  Halblaub then talked to Ms. Brihan the next week (Halblaub Tr., pg. 109).

Over two months after Halblaub was aware of the Brihan job, on or about August 23, 2010, Ms. Brihan contacted SERVPRO to complain about her bill.    Despite the allegations by Defendants, Ms. Brihan's complaints were not solely about Adams. (Adams Tr., pgs. 77-78).  During a phone conversation a couple of days later, with Valega, Halblaub and Adams, Ms. Brihan outlined her complaints, including issues with the bills being incorrect, and the scheduling of the job.  (Adams Tr., pg. 78).  In particular, Ms. Brihan was upset that she was billed for things which were not done at her house, however, these items will billed by SERVPRO due to errors by SERVPRO's billing department.  (Adams Tr., pgs. 78-79).  Ms. Brihan had other complaints regarding the work done by Adams and her co-worker in June 2010, all of which were unfounded or over exaggerated, such as Adams' and her co-worker using dirty water. (Adams Tr., pgs. 77-92).  Adams explained to Valega that Ms. Brihan's complaints were unfounded, and Valega told

her it would be okay and not to worry about it (Adams Tr., pg. 92; Valega Tr., pg. 100)[5]. Surprisingly, Valega alleges that she had never had a customer complaint before this one, which is directly contradicted by Audrey Artino who states that SERVPRO has received customer complaints in the past. (Affidavit Artino, ¶ 3).   Notably, Adams was not given a write-up or disciplined for this alleged incident in August 2010, despite both Halblaub knowing about Ms. Brihan's allegations. (Adams Tr., pg. 92; Halblaub Tr., pg. 107).  SERVPRO did, however, write up a summary of Ms. Brihan's allegations which conveniently turned in to a "write-up" and part of the basis for Adams' termination after October 13, 2010.  (Valega Tr., Ex. K, ¶13).

2) October 7 & 8th Attitude Incidents[6] [7]

Defendants also allege that Adams' "attitude" on October 7th and 8th, 2010, was also a factor in the decision to terminate Adams.  (Halblaub Tr., Ex. l).  There purports to be statements from Adams supervisor, Diana Scott, that she had "poor attitude" on these dates, however, the statements conflict with each other.  (Halblaub Tr., Ex. l).   Several statements allege Adams had "attitude" on both days, but a longer description of the issues on both days, shows Adams was not the only individual with attitude and that other employees named Tracy and Mike had attitude. (Halblaub Tr., Ex. l).   Notably, Adams did not receive a warning nor was this issue discussed with her prior to her termination.  (Adams Tr., pg. 100).   Not surprisingly, Tracy Vanatta was not written up.   (Kimberlin Tr., Exhibit N).

3) Adam's Work Attendance

As noted above, Defendants argue one of the reasons for the termination of Adams employment was her absenteeism. (Valega Tr., Ex. K, ¶¶ 6, 13). However, this is disingenuous,

---

[5] As an example of SERVPRO's motto –Kimberlin in his deposition testified, "the customer is always right" no matter what.   (Kimberlin Tr., pg. 62).

[6] Interestingly, there are a number of different statements to this incident in Halblaub Tr. Exhibit L, it is unclear when they were written as none of them are actually signed and dated.

[7] Adams also denied in her deposition failing to clean under a bed on October 11, 2012 and subsequently lying about it.  (Adams Trans. pg. 245).

particularly because as the attendance records show, that Defendants have grossly overstated Adams' absenteeism and that many of Adams' days off, or where she arrived late or left early were approved long in advance.  (Adams Tr., Ex. 4, 5, 6)[8]   For example, Defendants allege that Adams missed 8.5 days from July 19th to August 26th, 2010 in support of her absenteeism issues. The truth is that five (5) of these 8.5 days were for a vacation Adams had requested time off for way back in January 2010.  This is just one example of Defendants' supporting their unfounded allegations by "docking" Adams for time off that they had previously approved and had no problem with.   Another example of the overstatement of Adams' attendance issues is shown, by Defendants counting time when Adams was injured on the job in June 2010 and missed three days of work. (Adams Aff, ¶ 6-26).   According to Valega, the above instances are examples of Adams' need for too many days off.  (Valega Tr., Ex. K, Att. A). These instances that Adam's needed time off work were counted against her, and were a basis for her termination of her employment.   (Valega Tr., Ex. K, ¶ 13).   This is contrary to SERVPRO's general policy that if an employee's time off was excused, than it is not held against them and has no disciplinary effects. (Valega Tr., pg 118).

E.   <u>Disparity between Adams' Discipline and Her Co-Worker's Discipline</u>

Not surprisingly Adams was treated differently than her other co-workers regarding discipline.  Tracy Vanatta, one of Adams' co-workers, was not written up regarding the October 7th and 8th complaints.   (Halblaub Tr., Exs. L & N).   Nor was Ms. Vanatta written-up for "insubordination" for failing to go to the job on October 13, 2010.  Ms. Vanatta's record shows that she was warned and threatened with termination in May 2010, but received several other disciplinary actions without being terminated, excluding the incidents on October 7, 8, and 13 which Vanatta was involved in which were later used to justify Adams' termination.  Notably,

---

[8] Halblaub testified that a check mark indicates that the time off is approved or disapproved.  (Halblaub Tr., pg. 52).

Kimberlin testified Vanatta's actions on the 13th were documented, but SERVPRO's documents to not support this statement. (Kimberlin Tr., pg. 53).

III.    LAW/ARGUMENT

    A.    Plaintiff Can Show that She Was Eligible[9] under the FMLA and that Defendants were Eligible Employers

The FMLA applies to companies that employ 50 workers within 75 miles of the eligible employers work site.  29 U.S.C. § 2611.   Defendants assert that since DES and Capital[10] are professional employer organizations ("PEO") that Adams cannot meet the numerosity requirements of the prima facie case.   However, under 29 C.F.R §825.106(b)(2) a PEO can be a joint employer based on the particular facts and circumstances of the parties' relationship.  *Id*. While Defendants assert that that DES/Capital does not have the ability to hire, fire, discipline, affect compensation and benefits, or direct and supervisor performance, Adams has shown from the evidence cited above that DES/Capital have been involved in the hiring and firing of SERVPRO personnel.  Adams' former boss Audrey Artino verified that Adams was not hired until DES approved and that other potential SERVPRO personnel were rejected by DES because of past workers' compensation claims. Furthermore, DES/Capital provided payroll services, employment benefits, and function as SERVPRO's human resources.

On top of that as outlined above, DES/Capital entered into a contractual relationship consistent with R.C. Chapter 4125 and Ohio Administrative Code 4123-17-15.[11]  These statutes when combined provide that a PEO is a co-employer of all the employees/personnel of its clients

---

[9] See Adams Aff, ¶ 1.

[10] Notably, there should be no argument that DES and Capital are an integrated employer/entity as they have common management and ownership, and DES employees take all actions necessary for Capital to operate.  Defendants have throughout that they are separate and distinct companies, but the evidence shows they are not.

[11] To be brief and preserve Defendants' arguments on confidentiality of the contract, Adams will not restate the terms of the contract but incorporates them by reference in her argument section on the Joint Employer issue.

and shares the responsibilities and liabilities of being an employer. R.C. 4125.01(B).  A PEO is distinguished from a temporary service agency" and statutorily has the right of direction and control over each person/employee working at a client's location. R.C. 4125.03(B); O.A.C. 4123-17-15.  The PEO must also maintain employment records, assume responsibility for wages, taxes and workers' compensation premiums even if the client does not pay the PEO.  R.C. 4125.03. (*See* Exhibit 9).

As such under the terms of the agreement between SERVPRO and DES/Capital, the laws of Ohio and the other evidence outline above, it is sufficient to establish a "joint employer" relationship pursuant to 29 § C.F.R. 825.106 and the case law interpreting same.  Of particular importance is the contractual relationship between the parties which is statutorily required in Ohio and mandates a joint employment relationship for which DES and Capital share the right of direction and control.[12] The same law applies to all of DES and Capital's clients, of whom more than 100 persons work within 75 miles of DES/Capital and SERVPRO's offices in Medina, Ohio. Therefore, the facts support a finding that a joint employer relationship and the FMLA numerosity requirements exist.  *See*, *Russell v. Bronson Heating  & Cooling,* 345 F.Supp.2d 761, 776 (E.D. Mich. 2004)(entity similar to PEO was joint employer where it prepared payroll, prepared employment policies, provided workers' compensation benefits, provided other employment benefits such as life and disability insurance, and had right to control employees.)

Importantly, under 29 C.F.R § 825.106, both employers in a joint employer relationship are responsible for compliance with the prohibited acts provisions of the FMLA.

---

[12] As such, Adams does not need to address the impact of *Dobrowski v. Jay Dee Contrs., Inc.* 571 F.3d 551 (6th Cir. 2009)

      B.    <u>Adams Can State a Prima Facie Case of Retaliation and There Is Sufficient Evidence To Show that the Reasons for Plaintiff's Termination Were Pre-Text</u>

To establish a prima facie case of FMLA retaliation, one must show that: (1) he/she was engaged in activity protected by the FMLA; (2) the employer knew that the employee was exercising his/her rights under the FMLA; (3) after learning that the employee was exercising their FMLA rights the employer took adverse action against the employee; and (4) there was a causal connection between the protective activity and the adverse employment action. *Killian v. Yorozu Auto. Tenn., Inc.,* 454 F.3d 594, 556 (6th Cir. 2006).  If the plaintiff states a prima facie case, then the familiar *McDonnell Douglas* burden-shifting test applies.  *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006).  The burden then turns to the plaintiff to show that the reasons for the employee's termination are pre-text by showing the proffered reason has no basis in fact, did not motivate the termination, or was insufficient to warrant the termination.  *Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008).

Here, Defendants assert that Adams has only temporal proximity alone to support her FMLA retaliation claim, and that under *Donald v. Sybra, Inc.*, 667 F.3d 757 (6th Cir. 2012) temporal proximity alone is insufficient to establish a causal connection.  Adams does have temporal proximity, as she was terminated only a week after being approved for FMLA, she has other evidence as well to show a subtext of animus.  First, in August 2010, she was essentially told that her employer wanted her to go part-time after she was written up for missing an "on call" page, while at the hospital with her husband.  Adams rejected the request, but it is important to note SERVPRO management testified they had never requested an employee take a part-time position[13] and that there essentially was <u>no</u> part time work.  Kimberlin, who terminated Adams, testified the offer of part-time was "it would be basically, if we need you, we call you to come to

---

[13]  Part-time does not include benefits.  (Valega Tr., Ex J, pg. 28)

14

work" and that the request was in part due to Adams "being on call and not being able to work it or something." (Kimberlin Tr., pg. 27). Further evidence of the causal connection is established by Adams' discussion in late September 2010 with Kimberlin regarding her FMLA request was being process and that she wanted to address the on-call situation after her FMLA was approved. Lastly, the causal connection is further solidified by Kimberlin's own statements in late December 2010. According to Adams, Kimberlin made statements to the effect that working and taking care of her husband would have been too much for her, along with an admission of "I know" to her response that "should have been [her] choice." (Adams Aff., ¶ 5). As such a sufficient causal connection exists between Adams' protected right of filing and seeking FMLA intermittent leave and the termination of her employment to satisfy the fourth and final prong of a prima facie case.

Defendants then assert that even if Adams could establish a prima facie case that they are protected by the "honest belief rule." *See Donald*, 667 F.3d at 763. However, nowhere under this honest belief rule does the *Donald* court override a plaintiff's ability to establish pre-text. In fact the *Donald* court notes that the pre-text test still applies. *Id.* at 763. As outlined below, Adams can establish that SERVPRO's proffered reasons for her termination either had no basis in fact or were insufficient to warrant the termination.

First, and most importantly, Defendants, by and through Valega, admit that Adams absences were a basis for the decision to terminate Adams. Valega's April 17, 2012 affidavit states that "due to "Mindy's absenteeism, insubordination, and misbehavior to customers" Adams employment was terminated. (Valega Tr., Ex. K, ¶ 13). It is therefore, unquestionable, as admitted by SERVPRO's owner that Adams taking time off work was used against her when her employment terminated. Moreover, the very evidence used to support their claim that Adams

15

absences were excessive, have been falsely bolsterd by including excused absences against Adams.   As examples of this Defendants have held against her time, among other things, 1) time she was off work for a on the job injury, and was sent home by Valega at the direction of DES, and 2) vacation time that she was approved for months in advance.  Adams has also shown that Defendants have overstated her absences from work or time taken off.

Second, Adams has shown that another alleged justification for her termination the Brihan job was overstated.  The evidence shows, first and foremost, Adams was never told that she was being written-up by SERVPRO and Adams testified that she was told not to worry about the matter.[14]  However, Valega in her affidavit states that "it was the worst she had ever received", but Adams was not told she was being disciplined and did not receive a write-up at that time. Moreover, the evidence shows that Halblaub was aware of the customer's complaints all the way back in June 2010, but took no action to address the issue or discipline Adams.  These two pieces of information alone show that the use of this customer complaint as pre-text.  On top of that Valega denied that SERVPRO ever had a customer complaint before stating - "never."  This is contradicted by SERVPRO's former president Audrey Artino that SERVPRO had received complaints in the past.

Third, the evidence shows that with regard to the alleged attitude issues of October 7th and 8th 2010, that Adams did not receive a write-up at that time regarding her alleged actions despite the "attitude" being reported on October 8th at the latest.  (Halblaub Tr., Ex. L).  The evidence also shows that other employees, including Tracy Vanatta, were also reported to have "attitude"

---

[14] The Court should note that Adams signature does not appear the Brihan complaint/write-up nor any other write up but the August 24 Employee Warning Notice related to the "on-call" incident where Adams was then asked to go part-time.

by the same supervisor, however, none of those other employees appear to have been were written up.[15]  (Kimberlin/Halblaub Tr., Ex. N).

Fourth, Kimberlin and Halblaub's versions of Adams' termination are not consistent with the timeline shown by the documents themselves.   According to Kimberlin, he and Halblaub had a final write-up prepared at the time they terminated Adams.  (Kimberlin Tr., pg. 74).   Notably, Adams was never shown or even given a copy of this "final write-up."  (Adams Aff., ¶ 5). The records produced by SERVPRO show that there wasn't any final termination write-up until October 20, 2010, when one was signed by Halblaub.  Further, SERVPRO was in contact with DES regarding the content of the write-up and even exchanged faxes and email correspondence between October 14, 2010 and October 15, 2010.  Lastly, Kimberlin's written statement at the time regarding his recollection makes no mention of Adams having attitude or being insubordinate.  (Kimberlin Tr., pg. 73-74, Ex. L).

Not surprisingly when Adams went to DES on October 14, 2010, the reason for her termination had changed from "attitude" to "insubordination" according to Mary Jo, a DES employee.  Notably, Mary Jo is the name of the employee to whom SERVPRO staff were sending additional write-ups to between October 14, 2010 and the date of the final write-up signed by Halblaub.   This too is evidence of pre-text, i.e. that the reasons proffered by Halblaub and Kimberlin were insufficient to motivate the termination and/or did not have a basis in fact.

SERVPRO's overstated reasons Adams' for termination of when combined with the temporal proximity between Adams filing for FMLA, the statements made by Kimberlin in late September 2010 and December 2010, as well as SERVPRO's  request Adams take a part-time

---

[15] The Court can take notice of the lack of a write-up for Tracy Vanatta in the disciplinary file produced and testified to during Kimberlin's deposition.

position are sufficient to establish pre-text.  As such, genuine issues of material fact exist and summary judgment is therefore inappropriate.

        C.   <u>Plaintiff Can State a Prima Facie Case of FMLA Interference</u>

In sum and substance, since Adams can state a prima facie case of FMLA retaliation and can establish SERVPRO's justifications for the termination are pre-text, her FMLA interference claim also has merit.

To establish an FMLA interference claim, a plaintiff must show that: 1) she was eligible for the FMLA's protections; 2) the employer was covered by the FMLA; 3) she was entitled to leave under the FMLA; 4) she or she provided sufficient notice of his intent to take leave; and 5) the employer denied the plaintiff an FMLA benefit to which the plaintiff was entitled. *See, e.g.*, *Cavin v. Honda of Am. Mfg., Inc.,* 346 F.3d 713, 719 (6th Cir.2003); *Russell v. N. Broward Hosp.,* 346 F.3d 1335, 1340 (11th Cir. 2003) (stating that the burden to establish an interference claim is generally less than that of a retaliation claim). Here Adams has shown that she was eligible for FMLA leave, her employer was covered by FMLA and that shortly after she provided notice of her intent to take intermittent leave that her employment was terminated.  As outlined above, because genuine issues of material fact exist as to Adams' FMLA retaliation claim, genuine issues of material fact also exist as to Adams' FMLA interference claim.

        D.   <u>Plaintiff Can State a Prima Facie Case of Associational Retaliation Under the ADA and That Defendants' Justifications for Plaintiff's Dismissal Are Pre-Text</u>[16]

To establish a prima facie case under on a associational discrimination claim the Sixth Circuit has followed the standard set under *Den Hartog v. Wasatch Acad.,* 123 F.3d 1067 (10th Cir. 1997); see *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482 (6th Cir. 2011).   The elements of a prima facie claim are:  (1) Adams was qualified for the position; (2) she was subject

---

[16] Adams objects to this Court's consideration of Exhibit G which is an EEOC document.  See Plaintiff's Motion to Strike

to an adverse employment action; (3) she was known to have a relative with a disability; and, (4) the adverse employment action occurred under circumstances that the disability was a determining factor in the decision. *See Stansberry*, 651 F.3d 482.   If the plaintiff establishes a prima facie case, then the burden shifting analysis under *McDonnell-Douglas* 411 U.S. 792, 802 (1973), applies.  *Id*.

Here, Adams easily meets the first three prongs as she was qualified for her job, she was terminated from her employment and representatives from Defendants, including Valega, Halblaub, Kimberlin, and Stephanie Postek from DES, were aware of her husband's medical condition.    As to the fourth prong, the evidence shows that Adam's first disciplinary issues occurred only a month after her husband first began having medical issues, which Defendants were aware of.  With regard to the August 22 "on call" situation, Adams had been approved for time off and had secured a replacement, but was still written up and was asked to go part time – which essentially meant she would be given no work or benefits.  As for the Brihan incident, the evidence shows 1) her superior Halbluab was aware of the customer complaints two months prior and took no action at that time to discipline Adams, 2) Adams was told by Valaga "not to worry about the complaint, but later 3) Adams was still somehow given a write-up which she never received.

Then, in late September 2010, only three to four weeks after she indicated to Valega, Halblaub and Postek she was going to file for FMLA, requested FMLA paperwork, received said FMLA paperwork, and notified another supervisor, Kimberlin, that she was filing for FMLA, Adams was told by Kimberlin that he would not make any changes to the "on-call" schedule even if Adams were approved for FMLA leave.  Then after Adams' termination, Kimberlin made a comment which clearly evidences that her husband's condition was a factor in the decision to

19

terminate her – namely telling her only months later that the job would have been too much for her.  These actions are all sufficient to raise a reasonable inference that the disability of Adam's husband and her need to take time off work and attend to his medical needs was due in some measure to Defendants' decision to terminate her employment.  *See Stansbury*, 651 F.3d at 488.

Further, on October 7, 2010, only a day after her FMLA paperwork was approved, and submitted to Defendants, Adams was written up for attitude by SERVPRO, even though the documentation clearly shows that other employees were not written up despite allegedly having "attitude" as well, in particular Vanatta.   Moreover, Vanatta received several write-ups without being terminated where as Adams was terminated for "attitude" only a week after her FMLA approval and two-three weeks after her supervisors were aware she was seeking FMLA leave. Lastly, and most importantly, Valega's own affidavit shows that Adams absences, i.e., need for time off were a basis for Adams' dismissal, despite Valega admitting that the records showed that Adams' absences were almost all approved.

The above evidence establishes that a causal connection exists between Adams' need for time off to address her husband's medical condition and the employment termination.  The evidence also establishes pre-text and counters SERVPRO's honest belief argument, and thus Plaintiff's claims are meritous.

IV.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that this Honorable Court deny Defendants' Motion for Summary Judgment as genuine issues of material fact exist as to Plaintiff's claims.

Respectfully submitted,

GRUBB & ASSOCIATES, LPA

/ss/ *Natalie F. Grubb*

Natalie F. Grubb (0062596)
437 W. Lafayette Road
Suite 260-A
Medina, Ohio 44256
Ph: (330) 725-7252
Fax: (330) 723-1095
E-Mail: officemgr@grubbandassoc.com
*Attorneys for Plaintiff*

## **CERTIFICATION**

Pursuant to Local Rule 7.1(f), the undersigned hereby certifies that this matter has been assigned to the standard track and that the Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment adheres to the page limitations for unassigned cases set forth in Local Rule 7.1.

*/ss/ Natalie F. Grubb*
One of the Attorneys for Plaintiff

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of September, 2012, a copy of the foregoing Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment was filed electronically.   Notice of this filing will be sent to all parties *via* operation of the Court's electronic filing system.


/ss/ *Natalie F. Grubb*
Natalie F. Grubb (0062596)
*Attorney for Plaintiff*

23