UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MINDY ADAMS,                    )  1:12CV0644
                                )
            Plaintiff           )
                                )
      v.                        )  MAG. JUDGE KENNETH S. McHARGH
                                )
VALEGA'S PROF. HOME             )
      CLEANING, INC.,           )
            et al.,             )
                                )
                                )
            Defendants          )  MEMORANDUM
                                )  AND ORDER


      The plaintiff, Mindy Adams ("Adams"), has filed an amended complaint

against defendants Valega's Professional Home Cleaning, Inc. (d.b.a., Servpro of

Medina County) (hereinafter, "Servpro"); Diversified Employee Solutions ("DES");

Capital Dimensions, Inc. ("Capital"); and Janis Valega ("Valega"); alleging (1)

retaliation and disability discrimination in violation of the Americans with

Disabilities Act, and (2) interference and retaliation in violation of the Family and

Medical Leave Act ("FMLA").  (Doc. 36.)

      The allegations of the complaint are that Adams was "hired by DES/Servpro"

in August 2009.[1]  Adams alleges that she was sent to work for Servpro, who

controlled her day-to-day job duties, and she was paid by Capital Dimensions, Inc.,

_____

      [1] But see doc. 54, DX A, Employment Agreement between Servpro and Adams.

which she believes to be an affiliate, owner or subsidiary of DES.  (Doc. 36, Am.Compl., at ¶ 11.)  The Answer clarifies that DES and Capital are "different and distinct corporations."  (Doc. 5, Answer, at ¶ 5.)

On Aug. 22, 2010, Adams's husband was diagnosed with cancer.  (Doc. 36, at ¶ 12.)  Several weeks later, on Sept. 13, Adams requested FMLA paperwork from Valega, the owner of Servpro.  Adams alleges that Valega told Adams to request the paperwork from DES.  Id. at ¶ 13.

On Sept. 13, Adams notified her supervisor, Mark Kimberlin ("Kimberlin"), that she intended to request FMLA leave, and requested that he remove her from the "on call" schedule because she anticipated the need for intermittent leave to care for her husband.  (Doc. 36, at ¶ 14.)

Adams alleges that she received FMLA paperwork from DES on Oct. 2, 2010. (Doc. 36, at ¶ 15.)  She alleges that DES received her FMLA paperwork on Oct. 5, and that her FMLA leave was approved on Oct. 6, 2010.  Id. at ¶ 16.

Adams alleges that she was fired a week later:

> On October 13, 2010, after returning from a job in Cleveland, [Adams] was called into the office by her Servpro supervisors Charleen Halblaub and Mark Kimberlin.  At that time they announced that [Adams] was being fired for "attitude."  Mark Kimberlin purportedly had three (3) sheets of paper in his hands that contained statements from other employees that stated that morning [Adams] was cursing and had an attitude.  [Adams] was not given the opportunity to see the statements.  Upon information and belief, [Adams] believes that her termination was ordered by Janis Valega, who owns Servpro[,] as a result of [Adams]'s need for time off from work to take care of her husband.

2

(Doc. 36, at ¶ 17.)  The following day, Adams was told by an employee of DES named "Mary Jo" that Adams had been terminated for insubordination.  Id. at ¶ 18.

The ADA claim is based on allegations that Adams was terminated "as a result of her husband's disability, record of impairment, and/or Defendants' perception that [Adams]'s husband was disabled that that [sic] her husband's disability and need for medical treatment would impair [her] ability to do her job." (Doc. 36, at ¶ 24.)  As to her FMLA claim, Adams alleges that she was entitled to leave under the FMLA as an eligible employee because of her husband's "chronic and long-term medical condition."  Adams alleges she was terminated because she exercised her protected rights.  Id. at ¶ 31.

The defendants have filed an Amended Motion for Summary Judgment. (Doc. 54, DX 2, Amended Motion; see also doc. 45.)  Adams has filed a brief in opposition (doc. 56-57[2]) and the defendants have filed a reply (doc. 58).

## I.  "MOTION TO STRIKE"

Adams filed a Motion to Strike pages and exhibits from the defendants' original motion (doc. 45) for summary judgment.  (Doc. 53.)  The defendants filed a brief in opposition, and a motion for leave to amend the motion for summary judgment.  (Doc. 54.)

---

[2] Portions of doc. 56 are redacted pursuant to a protective order; doc. 57 is unredacted for authorized users.

A "motion to strike" applies only to pleadings.  Fed. R. Civ. P. 12(f).  A motion to strike is technically not available to motions for summary judgment.  Pilgrim v. Trustees of Tufts College, 118 F.3d 864, 868 (1st Cir. 1997).[3]  See generally, 5C Wright & Miller, Federal Practice and Procedure § 1380.

Rule 56(c)(4) sets the standards which affidavits to a motion for summary judgment must satisfy, but the rule makes no provision for "striking" those documents which do not conform.  Fed. R. Civ. P. 56.  Nonetheless, some courts have entertained objections, which are often styled as motions to strike, to such documents.  See, e.g., Pilgrim, 118 F.3d at 868; Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996); Admiral Maintenance, 174 F.R.D. at 646.  But see Hipolito, 2005 WL 1662137, at *2 (denying improper motion to strike statements in motion); National Union, 2002 WL 1482625, at *6 (denying improper motion to strike).  Indeed, unless a party objects to an objectionable affidavit or exhibit, the objection or defect is deemed waived.  Bennett v. University Hosp. of Cleveland, 981 F.Supp. 1065, 1068 (N.D. Ohio 1997) (citing Wiley v. United States,

---

[3] See also Hipolito v. Alliance Receivables Mgmt., Inc.,  No. C-05-0842, 2005 WL 1662137, at *2 (N.D. Cal. July 15, 2005); National Union Fire Ins. Co. of Pittsburgh v. Hicks, Muse, Tate & Furst, Inc., No. 02Civ.1334, 2002 WL 1482625, at *6 (S.D. N.Y. July 10, 2002); E.E.O.C. v. Admiral Maintenance Serv., L.P., 174 F.R.D. 643, 646 (N.D. Ill. 1997) ("overwhelming weight of authority" holds motion to strike does not apply to affidavits to summary judgment motion); Cobb v. Monarch Fin. Corp., 913 F.Supp. 1164, 1181 (N.D. Ill. 1995) (no authority to strike summary judgment motion); International Longshoremen's Ass'n, Local 1624 v. Virginia Int'l Terminals, Inc., 904 F.Supp. 500, 504 (E.D. Va. 1995) (citing cases) (affidavits are not pleadings).

20 F.3d 222, 226 (6th Cir. 1994)).  Adams' "motion to strike" will be considered as objections to the exhibits at issue.

First, Adams cites Local Rule 7.1(f), and points out that the motion for summary judgment does not contain the table of contents, table of authorities cited, brief statement of issues to be decided, and summary of the argument presented, which are required for memoranda over 15 pages in length.  (Doc. 53, at 2, quoting LR 7.1(f).)  Adams also contends that Exhibits C, D, and G were not properly authenticated pursuant to the Federal Rules of Evidence, and thus should not be considered admissible evidence.  Id. at 3.

In response, defendants apologize for the lacking tables, etc., and move for leave to amend their motion for summary judgment, omitting quotations from deposition testimony to bring their memorandum within 15 pages, thus omitting the need for the tables.  (Doc. 54, at 2, and DX 2, amended motion.)  The legal arguments, and citations to factual support in the record, have not been altered. See generally doc. 45 and doc. 54, DX 2, amended motion.

Local Rule  7.1(f) provides that failure to comply with its provisions "may be sanctionable at the discretion of the Judicial Officer."  In the interest of resolving the issues before the court on their merits, the court declines to sanction defendants.  The court denies the motion (doc. 53), as to the issue of the missing tables, etc., and grants the motion for leave (doc. 54) to file an amended motion for summary judgment.  Because the attached exhibit to the motion for leave contains

an amended motion not exceeding 15 pages, the court will consider Exhibit 2 to doc.
54 as the defendants' amended motion for summary judgment.  Because the legal
arguments, and citations to factual support in the record, have not been altered, the
opposition filed by Adams will suffice to address the identical arguments in the
amended motion.

Adams also  moves to strike Exhibits C, D, and G to the motion as not
properly authenticated.  (Doc. 53, at 3-4.)  Exhibit C is a "Work Performance
Appraisal" from Buehler's Fresh Foods.  (Doc. 45, DX C.)  Exhibit D is an Aug. 11,
2012, letter to defendants' counsel from Rick Lowe, VP of Human Resources at
Buehler Food Markets, Inc., concerning Adams' work history there.  (Doc. 45, DX
D.)  The defendants claim that these two documents are "business records kept in
the ordinary course of business on company letterhead attesting to their accuracy."
(Doc. 54, at 1.)

Documents submitted in support of a motion for summary judgment must
satisfy the requirements of Rule 56; otherwise, they must be disregarded.  Michigan
Paytel Joint Venture v. City of Detroit, 287 F.3d 527, 532 n.5 (6th Cir. 2002)
(quoting Logan v. Denny's, Inc., 259 F.3d 558, 570 (6th Cir. 2001)); see also
Magnum Towing & Recovery v. City of Toledo, No. 07-4212, 2008 WL 2744631, at
*4 (6th Cir. July 15, 2008).  Civil Rule 56(c)(4) sets the standards which affidavits to
a motion for summary judgment must satisfy.  Documents must be authenticated
by, and attached to, an affidavit, which must be made on personal knowledge, set

6

forth facts that would be admissible in evidence, and show affirmatively that the affiant is competent to testify to the matters.  Fed. R. Civ. P. 56(c)(4); Article II Gun Shop, Inc. v. Gonzales, 441 F.3d 492, 496 (7th Cir.), cert. denied, 549 U.S. 995 (2006); Hoffman v. Applicators Sales And Service, Inc., 439 F.3d 9, 16 (1st Cir. 2006).

Exhibits C and D are not accompanied by the required affidavit, and thus will not be considered in ruling on the motion for summary judgment.

Exhibit G is the Dec. 9, 2011, EEOC "Dismissal and Notice of Rights" concerning Adams' charge to the EEOC.  (Doc. 45, DX G.)  The defendants argue it is self-authenticating under Evid. Rule 902 because it is a government document, and that Adams "has previously used the EEOC filings in her motion."  (Doc. 54, at 2.)

Under the ADA, as under Title VII, a claimant must exhaust her administrative remedies by filing a charge of discrimination with the EEOC before filing suit in federal court.  Apsley v. Boeing Co., 691 F.3d 1184, 1210 (10th Cir. 2012); Dao v. Auchan Hypermarket, 96 F.3d 787, 788-789 (5th Cir. 1996) (citing cases); Campau v. Orchard Hills Psychiatric Ctr., 946 F.Supp. 507, 509 (E.D. Mich. 1996).  Although Adams does not specifically allege that she filed an EEOC charge, the defendants attach the EEOC Dismissal and Notice of Rights as an exhibit to their motion.  Adams does not claim that the exhibit is not authentic; she merely claims that its legal weight is misrepresented by defendants.  As argued by Adams,

correctly, the findings of the EEOC do not have a preclusive effect on the proceedings in federal court, which are de novo proceedings.  See, e.g., McDonnell Douglas Corp. v. Green, 411 U.S. 792, 798-799 (1973).  That argument goes to its weight as evidence.  However, the court does not find this argument well-taken as to the motion to strike, and the document as offered by defendants establishes that Adams exhausted her administrative remedies.

The motion is denied as to Exhibit G, but as discussed earlier, the motion is well-taken as to Exhibits C and D, which will not be considered in ruling on the motion for summary judgment.

## II.  SUMMARY JUDGMENT

Civil Rule 56 was totally revised by amendment effective December 2010. However, the Committee Note makes it clear that the standard for granting summary judgment remains unchanged.  However, the specific language of the Rule has been modified.

Summary judgment is appropriate where the record "shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Non-moving parties may rest neither upon the mere allegations of their pleadings nor upon general allegations that issues of fact may exist.  See Bryant v. Commonwealth of Kentucky, 490 F.2d 1273, 1275 (6th Cir. 1974).  The Supreme Court held that:

. . . Rule 56(c)[4] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The evidence need not be in a form admissible at trial in order to avoid summary judgment, but Rule 56(e) requires the opposing party:

. . . to go beyond the pleadings and by [his] own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

Id. at 324.

The Sixth Circuit in Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir. 1989), interpreted Celotex and two related cases, Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co., Ltd. v. Zenith Radio, 475 U.S. 574 (1986), as establishing a "new era" of favorable regard for summary judgment motions.  Street points out that the movant has the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.  This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.  Street, 886 F.2d at 1479.

The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in

_____

[4]  Now Rule 56(a).

9

order to defeat a properly supported motion for summary judgment." Id.  In ruling

on a motion for summary judgment, the court must construe the evidence, as well

as any inferences to be drawn from it, in the light most favorable to the party

opposing the motion.  Kraus v. Sobel Corrugated Containers, Inc., 915 F.2d 227, 229

(6th Cir. 1990).

## III. DISCRIMINATION IN VIOLATION OF ADA

The Americans with Disabilities Act (ADA) applies where there is a disabled

person within the meaning of the Act.  Under the ADA, an individual is disabled if

he: (1) has a physical or mental impairment that substantially limits one or more of

his major life activities; (2) has a record of such an impairment; or (3) is regarded as

having such an impairment.  Olds v. United Parcel Service, Inc., No. 03-1920, 2005

WL 742804, at *2 (6th Cir. Apr. 1, 2005) (citing 42 U.S.C. § 12102(2)); Stokes v.

Hamilton County, Tenn., No. 03-5751, 2004 WL 2452549, at *2 (6th Cir.  Oct. 28,

2004).

A person with cancer may or may not be disabled, depending on the diagnosis

of impairment, if any.  The cancer may be in remission, or it may be treatable and

result in temporary limits, or it may be totally disabling, depending on the

individual's circumstances.  See, e.g., Olds, 2005 WL 742804, at *2 (although

diagnosed with cancer, plaintiff not so physically impaired that he is disabled as

10

defined by the ADA); Stokes, 2004 WL 2452549, at *3 (despite past cancer, physically qualified to perform variety of jobs at present).

Although Adams has alleged that her husband had cancer, she has not alleged the specifics of his diagnosis, or his specific impairment.  See generally doc. 36, at ¶¶ 12, 14, 20; doc. 56, at 5; doc. 57, at 5.  Adams alleges generally that her husband's "physical and/or mental impairment substantially limits one or more life activities, including but not limited to, [his] ability to see, hear, walk, stand, speak, breath[e], read, concentrate, think, communicate, and work."  (Doc. 36, at ¶ 21.)

In any event, the defendants do not challenge Adams' ADA claim on this basis.  Rather, they contend that "Adams has not offered evidence, direct or otherwise, to create a reasonable inference that her husband's illness was a determining factor in her termination."  (Doc. 54, DX 2, Am. Motion, at 13.) Instead, the defendants assert that her firing was legitimate, "a direct result of her absenteeism, insubordination and misbehavior, and nothing else."  Id. at 14. Absent a challenge to her husband's status, the court will assume that Adams' husband was a qualified individual with a disability as defined by the ADA.

The Sixth Circuit has found that a claim of "association discrimination" under the ADA arises under Section 12112(b)(4), which prohibits "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to

have a relationship or association."  Stansberry v. Air Wisconsin Airlines Corp., 651 F.3d 482, 486 (6th Cir. 2011) (quoting 42 U.S.C. § 12112(b)(4)).

The court found that "employers are not required to provide reasonable accommodations to non-disabled workers under this section of the Act." Stansberry, 651 F.3d at 486-487; see also Magnus v. St. Mark United Methodist Church, 688 F.3d 331, 336 (7th Cir. 2012).  For example, an employee may be fired under a neutral policy concerning attendance or tardiness, even if the reason for the absence or tardiness is to care for the disabled spouse.  Id. at 486.  There is a distinction between firing an employee because of a relative's disability, and firing an employee because of the need to take time off to care for the relative.  Erdman v. Nationwide Ins. Co., 582 F.3d 500, 510 (3d Cir. 2009).

Where there is no direct evidence of discrimination, and Adams points to none here, the claim is analyzed under a McDonnell Douglas burden-shifting test. Stansberry, 651 F.3d at 487 (citing Den Hartog v. Wasatch Acad., 129 F.3d 1076, 1084 (10th Cir. 1997)).  Adams would have to establish the following four elements for a prima facie case of associational discrimination:

> (1) the employee was qualified for the position; (2) the employee was subject to an adverse employment action; (3) the employee was known to be associated with a disabled individual; and (4) the adverse employment action occurred under circumstances that raise a reasonable inference that the disability of the relative was a determining factor in the decision.

Stansberry, 651 F.3d at 487.  Recently, the Sixth Circuit clarified the fourth element of an ADA discrimination claim, finding that since the ADA bars

12

discrimination "because of" the disability, the relevant question is whether the employer would have taken the adverse action "but for" the disability.  Lewis v. Humboldt Acquisition Corp., Inc., 681 F.3d 312, 321 (6th Cir. 2012) (en banc); see also Saley v. Caney Fork, LLC, No. 3:11CV00824, 2012 WL 3286060, at *12 (M.D. Tenn. Aug. 10, 2012); 42 U.S.C. § 12112(b)(4).

The defendants challenge Adams' claim on the fourth element.  (Doc. 54, DX 2, Am. Motion, at 13-14.)  They point to evidence that Adams was terminated for inappropriate conduct toward customers and co-workers, along with tardiness and unexcused absences.  (Doc. 54, Am. Motion, at 2-3; doc. 54, DX [H], Exh. 2 to Adams dep.)

The issue is whether the employer would have terminated Adams for the reasons stated "but for" her husband's disability.  Lewis, 681 F.3d at 321; Stansberry, 651 F.3d at 487.  The Oct. 20, 2010, "Disciplinary and/or Sep[a]ration Form" which was signed by Halblaub on behalf of Servpro reads as follows:

> Reason:  Mindy did not follow proper procedures in traveling to a job site.  She is a crew leader and left the office late, making the team tardy to a commercial job site.  This was a high priority job and Mindy did not treat it as such.  She also caused a problem with a co-worker that she was to travel with, then proceeded to be disrespectful and insubordinate with her manager.
>
> Policy Violated:  Tardiness, Disrespect, Insubordination, Inappropriate conduct.
>
> Previous Warnings:  On 8/20/2010, Mindy called and stated that her husband was very sick.  She had requested excessive days off, leaving early and coming in late.  On 8/22/2010, Mindy did not answer a page until the next day.  This is unexceptable! [sic]  On 8/23/2010, a serious

customer complaint occurred. The homeowner felt she had been lied to and treated poorly by Mindy. She said that Mindy had been disrespectful and not cleaned her house properly. The owner of Servpro was brought into it and eventually had to apologize and buy the customer flowers. On 10/7/2010, Mindy was displaying a poor attitude going to the job site and on the job site. Diana Scott was the Crew Chief and didn't report this to the office until the end of the day on 10/8/2010. This was not addressed with Mindy at the time of occurance [sic] because Diana feared it would make matters worse at the site. On 10/11/2010, Mindy was on a job site and then on 10/12/2010, the homeowner from the site complained of the area under a bed not being cleaned. Mindy lied and said that it was clean, she had done it. Mindy is a crew leader and lied about doing her job.

(Doc. 54, DX [H], Exh. 2 to Adams dep.)

The defendants argue that "Adams' performance was unsatisfactory and the write-ups prior to her termination warranted said termination." (Doc. 54, DX 2, Am. Motion, at 2.) They assert that Adams conceded at her deposition that Servpro was reasonable in relying on the write-ups for her termination. Id., citing doc. 54, DX [H], Adams dep., at 246, 213-214.)

The defendants point out that Servpro had given Adams time off in the past to care for her husband when she needed it. (Doc. 54, DX 2, Am. Motion, at 2-3, citing doc. 54, DX [H], Adams dep., at 164; see also Adams dep., at 214-215.) Also, Adams had been offered a part-time schedule, which she refused. (Doc. 54, DX 2, Am. Motion, at 2, citing doc. 54, DX [H], Adams dep., at 228.)

Adams responds that "the evidence shows that Adams' first disciplinary issues occurred only a month after her husband first began having medical issues, which Defendants were aware of." (Doc. 56, at 19; doc. 57, at 19.) She argues that

the discipline was unfair or undeserved, id., at 19-20, and states that the defendants' allegedly unfair discipline is "sufficient to raise a reasonable inference that the disability of Adams' husband and her need to take time off work and attend to his medical needs was due in some measure to Defendants' decision to terminate her employment." (Doc. 56, at 20; doc. 57, at 20.)  Adams believes that the evidence "establishes a causal connection exists between [her] need for time off to address her husband's medical condition and the employment termination." Id.

As discussed earlier, however, even if the evidence were to establish a connection between her need for time off to care for her husband, and her termination, that does not violate the statute.  See, e.g., Stansberry, 651 F.3d at 486-487; Overley v. Covenant Transport, Inc., No. 05-5280, 2006 WL 1133292, at *4 (6th Cir. Apr. 27, 2006).

The Sixth Circuit has noted that "employers are not required to provide reasonable accommodations to non-disabled workers under this section of the Act." Stansberry, 651 F.3d at 486-487; see also Magnus, 688 F.3d at 336; Overley, 2006 WL 1133292, at *4.  An employee may be fired for attendance or tardiness reasons, even if the reason for the absence or tardiness is to care for the disabled spouse, without violating the ADA.  Stansberry, 651 F.3d at 486.  The Third Circuit noted the distinction between firing an employee merely because of a relative's disability, and firing an employee because of the need to take time off to care for that relative. Erdman, 582 F.3d at 510.  While a refusal to make reasonable accommodations may

15

constitute illegal discrimination against a disabled employee, the accommodation

requirement does not extend to relatives of the disabled.  Id.

The Sixth Circuit addressed the distinction more fully in Stansberry:

The legislative history accompanying this section, H.R.Rep. No.
101–485, pt. 2, at 61–62 (1990), reprinted in 1990 U.S.C.C.A.N. 303,
343–44, explains the type of conduct that is prohibited.

> [A]ssume, for example that an applicant applies for a job
> and discloses to the employer that his or her spouse has a
> disability.  The employer believes the applicant is
> qualified for the job.  The employer, however, assuming
> without foundation that the applicant will have to miss
> work or frequently leave work early or both, in order to
> care for his or her spouse, declines to hire the individual
> for such reasons.  Such a refusal is prohibited by this
> subparagraph.
>
> In contrast, assume that the employer hires the applicant.
> If he or she violates a neutral employer policy concerning
> attendance or tardiness, he or she may be dismissed even
> if the reason for the absence or tardiness is to care for the
> spouse.  The employer need not provide any
> accommodation to the nondisabled employee.  The
> individuals covered under this section are any individuals
> who are discriminated against because of their known
> association with an individual with a disability.

Importantly, employers are not required to provide reasonable
accommodations to non-disabled workers under this section of the Act.
See 29 C.F.R. § 1630.8 App. at 379 (2007); Larimer v. Int'l Bus. Machs.
Corp., 370 F.3d 698, 700 (7th Cir.2004); Den Hartog v. Wasatch Acad.,
129 F.3d 1076, 1084 (10th Cir.1997).

Stansberry, 651 F.3d at 486-487.

Adams has not put forward evidence satisfying the "but for" element.  In

other words, although the defendants have put forward evidence that she was fired

as an at-will employee for performance problems and personality conflicts, in addition to attendance issues, Adams points to no evidence in the record to suggest that her termination would not have occurred but for unfounded fears concerning the effect that her husband's disability might have on her work performance.  See, e.g., Stansberry, 651 F.3d at 488; see also Magnus, 688 F.3d at 338; Erdman, 582 F.3d at 510-511.

Adams' arguments attack the fairness of the disciplinary decisions that Servpro made.  But the Sixth Circuit has stated:

> A plaintiff cannot bypass the prima facie showing requirement and must offer some evidence to suggest that the adverse employment action he or she suffered was due in some measure to discriminatory animus before the employer is required to articulate a non-discriminatory reason for the action.

Stansberry, 651 F.3d at 488 (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-148 (2000)).

The issue is not whether the decision to fire Adams was "wrong," but whether it was based on forbidden discriminatory animus.  Magnus, 688 F.3d at 338; see also Donald, 667 F.3d at 763; Kelly v. Drexel Univ., 907 F.Supp. 864, 876 (E.D. Pa. 1995), aff'd, 94 F.3d 102 (3d Cir. 1996) (concern is not whether decision was prudent or factually correct, but whether based on discriminatory animus; ADEA).  An employer may generally fire at at-will employee for any reason that is not discriminatory.  See generally Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006); Wilkins v. Eaton Corp., 790 F.2d 515, 521 (6th Cir. 1986).

17

Adams has failed to demonstrate a prima facie case of discrimination under the ADA.  A plaintiff must present evidence to suggest that the adverse employment action resulted from prohibited discriminatory animus before the employer is required to articulate a non-discriminatory reason for the action. Stansberry, 651 F.3d at 488-489.  Adams has failed to do so.

The motion for summary judgment is granted on the ADA claim.

## IV.  MEDICAL LEAVE ACT (FMLA)

The second count alleges that the defendants wrongfully terminated Adams by interfering with her legal rights, and in retaliation for availing herself of her rights, under the Family and Medical Leave Act ("FMLA").  (Doc. 36, ¶¶ 28-29.) Adams alleges that she was an eligible employee, who requested FMLA leave to care for her husband's qualified serious heath condition.  Id. at ¶¶ 29-31.  She claims that the defendants wrongfully terminated her to interfere with, and in retaliation for availing herself of, her FMLA rights.  Id. at ¶ 31.

The record shows that Adams applied for intermittent FMLA leave to care for her husband on Sept. 27, 2010.  (Doc. 54, DX E, at 1.)  Adams was informed that she was eligible for FMLA leave.  (Doc. 54, DX E, at 1.)  Adams provided information from the health care provider in support of her request.  (Doc. 54, DX E, at 5-7.) Subsequently, on Oct. 6, 2010, Adams was notified that her FMLA leave request had been approved.  (Doc. 54, DX E, at 8.)

18

According to her separation notice, Adams was terminated for "tardiness, disrespect, insubordination, [and] inappropriate conduct" on Oct. 20, 2010.  (Doc. 54, DX [H], Exh. 2 to Adams dep.)

### A. Interference with FMLA Rights

Adams alleges two violations of the FMLA in her complaint.  First, she alleges that the defendants interfered with her exercise of her legal rights under the FMLA.  Under 29 U.S.C. § 2615(a)(1), an employer violates the FMLA by interfering with the exercise of, or the attempt to exercise, FMLA rights by an eligible employee.  To establish a prima facie case of interference, Adams must demonstrate that:

> (1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of her intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled.

Donald v. Sybra, Inc., 667 F.3d 757, 761 (6th Cir. 2012) (quoting Killian v. Yorozu Auto. Tenn., Inc., 454 F.3d 549, 556 (6th Cir. 2006)); see also Romans v. Michigan Dept. of Human Serv., 668 F.3d 826, 840 (6th Cir. 2012).

The defendants draw the court's attention as well to the following recent ruling of the Sixth Circuit:

We have noted that:

> "[A]n employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting that

19

request."  An employee lawfully may be dismissed,
preventing him from exercising his statutory rights to
FMLA leave or reinstatement, but only if the dismissal
would have occurred regardless of the employee's request
for or taking of FMLA leave.

Arban v. West Publ'g Corp., 345 F.3d 390, 401 (6th Cir. 2003) (citation
omitted) (quoting Gunnell v. Utah Valley State Coll., 152 F.3d 1253,
1262 (10th Cir. 1998)).  Bowe's decision to terminate Mann's
employment was unrelated to her request for FMLA leave, given that
there is no evidence that he was aware of her intent to request FMLA
leave when he made the termination decision.  Mann's request for
FMLA leave does not shield her from the previously-made decision to
terminate her employment.

(Doc. 54, DX 2, Am. Motion, at 8, quoting Mann v. Navicor Group, LLC, No.

11–4028, 2012 WL 2926275, at *5 (6th Cir. July 18, 2012) (per curiam).)

The defendants argue that Adams' request for FMLA leave was approved,

"even if mistakenly," although she did not use the leave, thus she cannot claim that

she was denied her FMLA benefits.  (Doc. 54, DX 2, Am. Motion, at 9, citing DX E.)

Therefore, the fifth element of the prima facie case cannot be satisfied.  The

defendants stress, however, that "the key consideration here is that Ms. Adams'

dismissal would have occurred regardless of her request for FMLA leave."  (Doc. 54,

DX 2, Am. Motion, at 9.)

The defendants contend that second element cannot be satisfied, either,

because the FMLA does not apply to the defendants, and so Adams is not an eligible

for leave under the statute.  (Doc. 54, DX 2, Am. Motion, at 3, 9-12.)  The

defendants assert that it was Servpro which hired Adams to perform cleaning

services for its clients.  Id. at 2.  They characterize DES and Capital as human resource companies, which provide payroll and tax administration services.  Id.

According to the affidavit of defendant Janis Valega, owner of Valega's Cleaning Service, d.b.a. Servpro of Medina, Servpro has fifteen ((15) employees. (Doc. 54, DX F, at ¶ 3.)  Valega used DES, and then Capital, "for human resources consulting services, payroll administration and health benefits."  Id. at ¶ 2.  Valega avers that neither DES nor Capital had any right to hire or fire Valega's employees, nor did they have any supervisory role or any control over Servpro employees, including Adams.  Id. at ¶¶ 3-5.  The defendants claim that Servpro was Adams' employer, and that DES was not involved in her termination at any stage of the process.  (Doc. 54, DX 2, Am. Motion, at 10.)  Therefore, because Servpro does not have fifty (50) employees, as required to come within the FMLA, the statute does not apply, and the second element of the prima facie case cannot be met.  Id. at 9-10.

The defendants also state that case law does not support the proposition that their mistaken granting of FMLA leave to Adams brings them under the statute.[5] (Doc. 54, DX 2, Am. Motion, at 11-12.)  The court interprets this argument to mean that defendants also contest a prima facie case under the third element.

_____

[5]  Adams does not raise an estoppel argument in her opposition to the motion, so the court will not address this issue.  See generally doc. 56, at 12-18; doc. 57, at 12-18.

Adams disagrees.  She relies on her arguments in support of her retaliation claim to establish a prima facie case of interference.  (Doc. 56, at 18; doc. 57, at 18.)

### 1.  Was the defendant an "employer" as defined under the FMLA?

The FMLA applies to companies which employ at least fifty (50) workers, all within 75 miles of the subject employer's worksite.  29 U.S.C. § 2611.  The defendants assert that DES and Capital are Professional Employer Organizations ("PEOs") which provided nothing more than human resource services, and did not have a joint relationship with the employees of their clients.  (Doc. 54, DX 2, at 10.)  Valega avers that neither DES nor Capital had any right to hire or fire Valega's employees, nor did they have any supervisory role or any control over Servpro employees, including Adams.  (Doc. 54, DX F, at ¶¶ 3-5.)

According to the Employment Agreement between Adams and Servpro, Valega's Professional Home Cleaning, Inc., d.b.a. Servpro of Medina, was the company that employed Adams.  (Doc. 54, DX A, at ¶ 1.)  The Employment Agreement between Adams and Servpro, signed by Adams and Valega on Sept. 23, 2009, "contains the entire agreement between the parties" concerning Adams' employment.  Id. at ¶ 22.

The regulations concerning "joint employer coverage" provide:

A type of company that is often called a "Professional Employer Organization" (PEO) contracts with client employers to perform administrative functions such as payroll, benefits, regulatory paperwork, and updating employment policies.  The determination of

22

whether a PEO is a joint employer also turns on the economic realities of the situation and must be based upon all the facts and circumstances.  A PEO does not enter into a joint employment relationship with the employees of its client companies when it merely performs such administrative functions.  On the other hand, if in a particular fact situation, a PEO has the right to hire, fire, assign, or direct and control the client's employees, or benefits from the work that the employees perform, such rights may lead to a determination that the PEO would be a joint employer with the client employer, depending upon all the facts and circumstances.

29 C.F.R. § 106(b)(2).

Some of the facts and circumstances which have been found particularly relevant include (1) the power to hire and fire employees, (2) supervision and control of employee work schedules or conditions of payment, (3) determination of rate and method of payment, and (4) maintenance of employment records. Moldenhauer v. Tazewell–Peking Consol. Commc'ns Ctr., 536 F.3d 640, 644 (7th Cir. 2008).  Generally, "for a joint-employer relationship to exist, each alleged employer must exercise control over the working conditions of the employee, although the ultimate determination will vary depending on the specific facts of each case."  Id.  See also Sanford v. Main Street Baptist Church Manor, Inc., No. 07-5869, 2009 WL 1410994, at *5 (6th Cir. May 20, 2009) (most significant consideration is extent of employer's control and supervision over worker, including directions on scheduling and performance of work) (Title VII).

A defendant who merely provides human resources services is not a joint employer under 29 C.F.R. § 825.106.  Id. at 645.  See also Kuhn v. Comfort Hospice Care, LLC, No. 2:11CV937, 2012 WL 27695, at *2 (D. Utah Jan. 4, 2012) (PEO not

23

joint employer where company provided only human resource functions, but had no supervisory or other authority over employees); Braden v. County of Washington, No. 08–574, 2010 WL 1664895, at *7 (W.D. Pa. Apr. 23, 2010) (no evidence defendant maintained direct or indirect control over work schedules or working conditions, determined (rather than approved) rate and method of compensation, or had power to hire or fire; also, no evidence that worker reported to, or received direction or supervision from, defendant).

Adams argues that there is evidence that DES/Capital[6] "have been involved in the firing and hiring of SERVPRO personnel." (Doc. 56, at 12; doc. 57, at 12.) She refers to testimony showing that potential Servpro employees were "rejected by DES because of past worker's compensation claims." (Doc. 56, at 12; doc. 57, at 12, citing, generally, testimony of Audrey Artino.) Adams also points out that "DES/Capital provided payroll services, employment benefits, and function[ed] as SERVPRO's human resources," without citing to specific evidence in support. Id.

As noted above, a company which provides human resources services, without supervisory or other control over employees, is not considered a joint employer under 29 C.F.R. § 825.106. Moldenhauer, 536 F.3d at 645; Kuhn, 2012 WL 27695, at *2. The testimony of Artino, former president of Servpro, does not establish that DES or Capital should be considered a joint employer, but rather supports a finding

---

[6] Although Adams repeatedly refers to "DES/Capital" throughout her briefing, the court notes that the Answer asserts that DES and Capital are "different and distinct corporations." (Doc. 5, Answer, at ¶ 5.)

24

that DES (or later, Capital) provided typical human resources assistance, as Adams appears to recognize.  See doc. 56, at 12; doc. 57, at 12 (DES provided payroll services and functioned as human resources).  In her affidavit, for example, Artino said that "on several occasions" Servpro consulted DES on the hiring of potential employees, and "DES would advise Servpro not to hire the potential employee," several times because of concerns about past workers' compensation claims.  (Doc. 56, PX 8, at ¶ 5, emphasis added.)  Artino notes that DES "reviewed and approved" Adams hiring.  Id. at ¶ 8.  Providing advice to Servpro about the suitability of potential employees, presumably based on a background check, is a routine human resources function, and does not equate to making the hiring decision itself.

Artino also avers that Tina Brosteck of Capital "terminated my employment." (Doc. 56, PX 8, at ¶ 6.)  The attached letter from Brosteck, as Director of Human Resources, does not state who made the decision to terminate Artino.  It merely states that the letter "confirms" her permanent layoff, because her position had been eliminated.  (Doc. 56, PX 8, at Exh. A.)  A communication from Human Resources about a termination may or may not indicate who was the decisionmaker behind the termination, and here that fact is unclear.  It certainly has little bearing on the termination of Adams.

The complaint alleges that Adams' termination was ordered by Janis Valega, who owns Servpro.  (Doc. 36, at ¶ 17.)  Adams' Separation Notice was signed by

25

Charlene Halblaub, Operations Manager of Servpro.  (Doc. 54, DX [H], Exh. 2 to Adams dep.)

Adams claims that the testimony of Valega shows that "in the past DES has been involved in termination of SERVPRO personnel."  (Doc. 56, at 3-4; doc. 57, at 3-4 (emphasis added), citing Valega dep., at 156-157.)  The involvement of human resources in a termination is not unusual; presumably, that is one of the main functions of a human resources department, to be involved in personnel matters. The power to terminate is the issue in the "joint employer" context.  Valega's testimony simply established that DES discussed "the more serious matters" concerning employee discipline and termination with her.  (Doc. 56, PX 2, Valega dep., at 157-158.)  The testimony does not show that DES had the power to fire or discipline.

Adams also refers to the testimony of Charlene Halblaub, Operations Manager of Servpro, to support the contention that "in the past DES has been involved in termination of SERVPRO personnel."  (Doc. 56, at 3-4; doc. 57, at 3-4 (emphasis added), citing Halblaub dep., at 26.)  Again, the testimony of Halblaub supports a finding that Capital and DES provided human resources support, not that either was a "joint employer":

> Q.  Now, have you ever heard of the corporation named Capital Dimensions, Inc.?
>
> A.  It's DES.

Q.  Okay.  Now, what's your understanding that Capital Dimensions, Inc. does?

A.  Benefits and payroll.

Q.  Have you ever attended a meeting put on by DES or Capital, as far as telling you about new labor regulations, anything having to do with new benefits, things of that nature?

A.  They come into the shop and talk about benefits.

Q.  Now, have they ever come into the shop regarding any employee termination or discipline?

In other words, have they come in to help?  To your knowledge, have you seen them walk in and they're there to discuss termination or discipline, anything of that nature?

A.  I don't recall.  Well, I know they took care of another Gabe.

Q.  Okay.  When you say "took care of another Gabe," what do you mean?

A.  They had to step in and come in when Gabe left.

(Doc. 56, PX 3, Halblaub dep., at 25-26.)  It is unclear what the testimony

concerning "Gabe" is intended to establish.  The cited testimony of Halblaub does

not show that DES or Capital had the power to fire or discipline.

Additionally, Adams points to a July 27, 2010, Service Agreement between

Servpro and Capital.  (Doc. 57, at 4, and PX A, designated "Confidential.")  The

Service Agreement includes a "duty to co-employ employees."  (Doc. 57, PX A, at

¶I.1.)  However, the Service Agreement indicates that "employees" includes "those

persons identified after the date of this Agreement to fill the positions agreed upon

by the parties."  Id. at p. 1.  Adams presents no evidence that she was one of the

27

"persons identified after the date of this Agreement to fill the positions agreed upon by the parties" under this July 2010 Service Agreement.  More importantly, neither does Adams present any evidence of a signed, written agreement between Adams and Servpro which is required to change or modify the pre-existing July 2009 Employment Agreement between them.  See doc. 54, DX A, at ¶ 22.

Under the FMLA regulations, "whether a PEO is a joint employer . . . turns on the economic realities of the situation and must be based upon all the facts and circumstances." 29 C.F.R. § 106(b)(2).  There is no evidence that the Service Agreement between Servpro and Capital, whatever its terms as between the two of them, actually governed the reality of the employment relationship between Servpro and Adams, whose Employment Agreement predated the Service Agreement.

Finally, Adams argues that "DES/Capital" should be considered a joint employer with Servpro because of the relationship between the companies under the Ohio workers compensation statutes.  (Doc. 56, at 12-13; doc. 57, at 12-13.) Adams does not provide any case authority which would support the proposition that a relationship between one company and another, to the extent required for coverage under state workers' compensation statutes, would govern the employer's status under federal law, specifically the FMLA.

The state's definition of a PEO differs substantially from that used in the FMLA regulations.  Under Ohio law,

28

> "Professional employer organization" means a sole proprietor, partnership, association, limited liability company, or corporation that enters into an agreement with one or more client employers for the purpose of coemploying all or part of the client employer's workforce at the client employer's work site.

Ohio Rev. Code § 4125.01(C); see also Ohio Adm. Code § 4123-17-15(A)(1).

Under the FMLA, in contrast, a "PEO" designates a company which "contracts with client employers to perform administrative functions such as payroll, benefits, regulatory paperwork, and updating employment policies." 29 C.F.R. § 106(b)(2). The FMLA contemplates that a PEO may be a joint employer, under certain circumstances. 29 C.F.R. § 106(b)(2); Moldenhauer, 536 F.3d at 644-645.

The State of Ohio requires all "'professional employer organizations,' organizations that provide human-resources management, employee benefits, payroll, and workers' compensation services, to, among other things, register with the administrator of workers' compensation and comply with workers' compensation laws," Roberts v. RMB Ents., Inc., 197 Ohio App.3d 435, 442, 967 N.E.2d 1263, 1268 (Ohio Ct. App. 2011).

Although state law interpreting Section 4125.01(C) is sparse, it would seem that there is a tension in the statute between equating an organization that merely provides human resources management, Roberts, 197 Ohio App.3d at 442, 967 N.E.2d at 1268, with a company that "enters into an agreement with one or more client employers for the purpose of coemploying all or part of the client employer's workforce at the client employer's work site," Ohio Rev. Code § 4125.01(C).  The

Roberts court found that it was not the intent of the legislature to make the statute applicable to a related company "who does not specialize in leasing employees to other employers," but rather performs human resource functions for the other company.  Roberts, 197 Ohio App.3d at 444, 967 N.E.2d at 1269.

The court does not find that the evidence before the court supports a ruling that DES or Capital were "joint employers" with Servpro under the FMLA. The evidence indicates that DES and Capital merely performed administrative functions for Servpro, and there is no evidence before the court that they had the right to directly hire or fire, or direct and control Servpro's employees, or benefit from the work that Servpro employees performed.  Moldenhauer, 536 F.3d at 644-645; Kuhn, 2012 WL 27695, at *2; Braden, 2010 WL 1664895, at *7; 29 C.F.R. § 106(b)(2). Because Servpro does not have fifty (50) employees, it is not subject to the requirements of the FMLA.  29 U.S.C. § 2611.

Even if the court found DES and Capital to be "joint employers" with Servpro, for the sake of argument, the combined entity would not have fifty employees.  Valega states that Servpro has 15 employees.  (Doc. 54, DX F, Valega aff., at ¶ 3.)  Adams notes that DES has 14 employees, and "Capital has no employees of its own."  (Doc. 56, at 1-2; doc. 57, at 1-2, citing Oddo dep., at 14.) That still only amounts to 29 employees.  Apparently, Adams would have the court include all the clients of DES and all the clients of Capital, and all of their

employees, into one massive conglomerate, to surmount the 50-employee threshold. See doc. 56, at 2, 13; doc. 57, at 2, 13.

The only case that Adams cites in support of this theory is Russell v. Bronson Heating and Cooling, 345 F.Supp.2d 761, 776 (E.D. Mich. 2004). (Doc. 56, at 13; doc. 57, at 13.)  Suffice it to say, the factual circumstances in that case do not support Adams' theory.  For one thing, the employer there admitted that "his understanding of the [personnel services] agreement was that [Company A] employees became [Company B] employees and were leased back to [Company A]." Russell, 345 F.Supp.2d at766.  No such leasing back is involved here, as to Adams. See generally doc. 54, DX A, Employment Agreement.  Neither did Russell involve combining the approximately 488 employees of over 150 clients into one massive "joint employer" relationship, as Adams suggests here.  See doc. 56, at 2; doc. 57, at 2.

The court finds that Adams has failed to establish the first and second elements of her prima facie case of interference, namely that she was an "eligible employee" because the defendant was an employer as defined under the FMLA.  29 U.S.C. § 2611; see generally Donald, 667 F.3d at 761; Romans, 668 F.3d at 840. Because the court finds that Servpro was not an employer subject to the FMLA, the contested third (employee entitled to leave under FMLA) and fifth (employee denied FMLA benefits to which she was entitled) elements of the prima facie case fail as well.

31

B.  Retaliation under the FMLA

Adams also alleges that the defendants wrongfully terminated her in retaliation for exercising her rights under the FMLA, in violation of 29 U.S.C. § 2615(a)(2).  To establish a prima facie case of retaliation, Adams must demonstrate that:

> (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

Donald, 667 F.3d at 761 (quoting Killian, 454 F.3d at 556).

Adams cannot satisfy the first element of her prima facie case.  As discussed earlier, Adams is not an "eligible employee" under the FMLA, because Servpro is not an employer subject to the statute.  29 U.S.C. § 2611(2)(b)(ii).  Thus, Adams was not "engaged in activity protected by the FMLA" in seeking leave, and cannot bring an FMLA retaliation claim.  Humenny v. Genex Corp., 390 F.3d 901, 904-906 (6th Cir. 2004); Goode v. Heritage Hospice, Inc., No. 5:10–342, 2012 WL 1038669, at *2-*3 (E.D. Ky. Mar. 26, 2012).  See also Davis v. Michigan Bell Telephone Co., 543 F.3d 345, 354 (6th Cir. 2008) (citing Humenny); Walker v. Elmore County Bd. of Educ., 379 F.3d 1249, 1253 (11th Cir. 2004); Shaw v. Total Image Specialists, Inc., No. 2:07CV00717, 2009 WL 369817, at *2-*3   (S.D. Ohio Feb. 12, 2009) (FMLA's "eligible employee" requirement applies in all FMLA cases, including retaliation cases); Pennant v. Convergys Corp., 368 F.Supp.2d 1307, 1313 (S.D. Fla. 2005).

The Sixth Circuit has rejected the argument that an employee who is not eligible for leave under the FMLA may nonetheless state a claim for FMLA retaliation. Humenny, 390 F.3d at 904-905.

## V.  SUMMARY

The motion to strike (doc. 53) is GRANTED in part, and DENIED in part, as discussed above.  The motion for leave to amend (doc. 54) is GRANTED, and the court will consider Exh. 2 to doc. 54 as the Defendant's Amended Motion for Summary Judgment.

The motion for summary judgment (doc. 45, as amended by doc. 54, DX 2) is GRANTED.  The motion is granted on the ADA claim, because employers are not required to provide reasonable accommodations to non-disabled workers under the ADA.  The motion is also granted on the FMLA claim(s).  Adams is not an "eligible employee" under the FMLA, because Servpro is not an employer subject to the statute.  29 U.S.C. § 2611(2)(b)(ii).

IT IS SO ORDERED.

Dated:   Nov. 2, 2012             /s/ Kenneth S. McHargh
                                  Kenneth S. McHargh
                                  United States Magistrate Judge

33